IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

CARLTON REMBERT,

                Defendant.

CRIMINAL ACTION
NO. 21-247

## OPINION

**Slomsky, J.**                                                       **June 6, 2024**

### TABLE OF CONTENTS

I.      **INTRODUCTION** ................................................................................................. 3

II.     **FACTUAL BACKGROUND** .............................................................................. 4

     A.  Defendant Byars' Position at RES Consulting and Position as a Guardian .................... 4

     B.  Defendant Rembert's Participation in the Scheme as Established at Trial .................... 6

     C.  Co-Conspirator Mitchell's Testimony at Defendant Rembert's Trial ........................... 12

III.   **STANDARD OF REVIEW** ............................................................................... 15

     A.  Federal Rule of Criminal Procedure 29: Motion for Judgment of Acquittal ................ 15

     B.  Federal Rule of Criminal Procedure 33: Motion for a New Trial ................................. 16

IV.   **ANALYSIS** ....................................................................................................... 17

     A.  Defendant Rembert's Motion for Judgment of Acquittal Will be Denied ..................... 17

         i.   The Evidence Presented at Trial is Sufficient to Sustain the
             Conviction on Count One .......................................................................... 17

ii.  The Evidence Presented at Trial is Sufficient to Sustain the
Conviction on Count Two ................................................................ 24

iii.  The Evidence Presented at Trial is Sufficient to Sustain the
Convictions on Counts Four and Six ............................................. 28

B. Defendant Rembert's Motion for a New Trial Will be Denied ..................................... 31

i.  Defendant Rembert's Motion for a New Trial Based on
Prejudicial Spillover Will be Denied ........................................ 31

ii.  Defendant Rembert's Motion for a New Trial Based on
Improper Venue Will be Denied ............................................... 32

iii.  Defendant Rembert's Motion for a New Trial Based on
the Court Permitting Defendant Alesha Mitchell's
Testimony Will be Denied ....................................................... 35

V.   **CONCLUSION** .................................................................................. 36

## I.      INTRODUCTION

On June 24, 2021, a grand jury returned an eight (8) count Indictment charging Defendants Carlton Rembert, Gloria Byars, and Alesha Mitchell with one or more of the following offenses: conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count One); bank fraud, in violation of 18 U.S.C. § 1344 (Count Two); wire fraud, in violation of 18 U.S.C. § 1343 (Counts Three through Seven); and money laundering, in violation of 18 U.S.C. § 1956 (Count Eight). (Doc. No. 1.)  On November 3, 2022, a Superseding Indictment was filed, which added two additional charges against Defendant Gloria Byars: filing a false income tax return, in violation of 26 U.S.C. § 7206(1) (Count Nine) and failure to file a tax return, in violation of 26 U.S.C. § 7203 (Count Ten).  (Doc. No. 77.)  Defendant Byars was the only Defendant charged in Counts Eight, Nine, and Ten.  (See id.)

On March 27, 2022, Defendant Alesha Mitchell pled guilty to the offense charged in Count One.  (Doc. No. 55.)  On November 3, 2023, Defendant Byars pled guilty to the offenses charged in Counts One, Seven, Eight, and Nine.  (Doc. No. 174.)  Defendant Rembert proceeded to trial.

On November 6, 2023, Defendant Rembert's trial with a jury began.  (Doc. No. 179.)  It took place over five (5) days and ended on November 14, 2023.  (See Doc. Nos. 197-202.)  At the conclusion of the Government's case-in-chief, Defendant Rembert moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.  (Doc. No. 200 at 193:10-201:23.) On November 14, 2023, the Court granted Defendant Rembert's Motion for Judgment of Acquittal on Counts Three and Five and denied the Motion on the remaining counts.  (Doc. No. 188.)  On the same day, the jury found Defendant Rembert guilty on Counts One, Two, Four, and Six, and not guilty on Count Seven.  (Doc. No. 190.)

Before the Court is Defendant Rembert's Motion for Judgment of Acquittal and a New Trial in which he contends that his convictions should be overturned, a judgment of acquittal

entered, or a new trial awarded.  (Doc. No. 205.)  For the reasons that follow, Defendant's Motion

for Judgment of Acquittal and a New Trial (Doc. No. 205) will be denied.

## II.      FACTUAL BACKGROUND

As noted, a jury convicted Defendant Rembert of conspiracy to commit bank fraud, in

violation of 18 U.S.C. § 1349 (Count One); bank fraud, in violation of 18 U.S.C. § 1344 (Count

Two); and two counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts Four and Six).  The

charges arose from his participation in a scheme to defraud incapacitated individuals.  In his

Motion for Judgment of Acquittal and a New Trial (Doc. No. 205), Defendant Rembert challenges

his convictions.  Resolving the Motion (Doc. No. 205) necessitates recounting the scheme

Defendant Rembert participated in, the role he and others played in the scheme, and the evidence

presented at his trial.

### A. Defendant Byars' Position at RES Consulting and Position as a Guardian

From 2008 to 2016, Defendant Gloria Byars worked as an office manager for Robert Stump

at RES Consulting.[1]  (Doc. No. 177 at 86:1-5.)  Stump owned and operated RES Consulting, which

provided guardianship services to incapacitated persons in Philadelphia, Pennsylvania, and its

surrounding counties.   (Id. at 83:6-85:19.)   Guardians are appointed by a court to protect

incapacitated individuals, also referred to as wards, by controlling their assets and assisting with

their living needs.  (Id.)  At trial, Stump described the status of a ward, and the duties of a guardian

as follows:

> [A] ward is the person that the court has given [a guardian] the responsibility to
> take and make sure that their lives continue the way they [] are and that [the
> guardians] protect them in every which way, shape, or form…. when you receive a
> ward through the court, they are deemed incapacitated.  That means that maybe
> they have a mental disability.  Maybe they have a physical disability.  Maybe
> mentally they can't be on their own.  They need guidance, and they need people
> helping them with their money, buy their food, make sure they go to appointments.

---

[1]    RES is short for Robert Stump's initials.  (Doc. No. 199 at 20.)

> Physically, maybe they are in a wheelchair, or maybe they have a walker or a cane. Our job is to make sure that they are safe in their home and also when they're out and make sure that they get to all their doctor's appointments…[f]inancially, they rely on [their guardians] to help make sure that their bills get paid.

(Id. at 84:12-85:11.)

As office manager for RES Consulting, Defendant Byars had access to, and control of, the finances of wards who were under Stump's care.  (Id. at 86:12-87:1.)  She also had access to a signature stamp with Stump's name that she could use to sign the wards' checks.  (Id. at 94:14-98:18.)

In 2016, in addition to working as the office manager for RES Consulting, Defendant Byars was appointed by the Pennsylvania Orphan's Court to serve as a legal guardian for elderly wards. (Id. at 28:19-29:15.)  While doing so, unbeknownst to Stump, she created her own guardianship business called Global Guardians Services ("GGS").  (Id. at 28:19-29:15, 123:3-124:1.)  Defendant Byars also set up and controlled a second company which she titled ICU[2] Records and Billing ("ICURB").  (Id. at 28:19-29:15.)  Thereafter, Defendant Byars funneled money from ward bank accounts to ICURB.  (Id. at 33:10-33:22.)  At trial, Detective Edward Rosen described Defendant Byars' scheme as follows:

Q.  [Assistant United States Attorney Samuel S. Dalke:] Did the investigation…ultimately uncover a fraud scheme?

A.  [Detective Rosen:] It did.

Q.  Okay.  And who was identified to be at the center of that fraud scheme?

A.  Gloria Byars.

Q.  Okay.  In very basic terms, kind of what was that fraud scheme, as you understand it?

---

[2]    Detective Edward Rosen testified at trial that in medical terminology, "ICU" stands for "[i]ntensive care unit with reference to a hospital or medical facility."  (Doc. No. 199 at 29:7-29:15.)

> A.  So in basic terms, Gloria Byars was initially, secretly operating a guardianship [business] under RES Consulting's office.  And she would take ward money that was -- people didn't know about and funnel it through ghost company -- or shell companies, which would come back to her as stolen money.

(Id. at 33:10-33:22.)   To perpetuate this scheme, Defendant Byars enlisted the help of several individuals including, her brother, Defendant Rembert, and her friend, Defendant Alesha Mitchell.

**B.  Defendant Rembert's Participation in the Scheme as Established at Trial**

In order to carry out her scheme, Defendant Byars recruited the help of her brother, Defendant Rembert.  The evidence at trial showed that Defendant Rembert created two companies: CWR Medical and Grace Home for Children d/b/a CWR Medical.  (Doc. No. 199 at 46:17-46:21.) Detective Rosen testified at trial that his investigation of bank records for CWR Medical and Grace Home for Children showed that Defendant Rembert had control of the financial accounts for both entities.  (Id. at 46:24-47:1.)

Between May 2015 and February 2018, CWR Medical and Grace Home for Children received and deposited forty-two (42) checks from wards' accounts along with four checks from Defendant Byars' ICURB and GGS accounts, totaling $695,517.78 in ward money.  See Gov. Trial Exs. 2a-2d, 3, 23; Doc. No. 199 at 46:17-48:2; Doc. No. 200 at 127:10-145:14.  These checks had notations on them that indicated that the checks were from wards for services rendered by CWR Medical or Grace Home for Children.  See Gov. Trial Exs. 2, 3.

Defendant Rembert deposited the checks from the wards' accounts into his companies' accounts.  His accounts were located in four (4) different banks.  In those banks, he had five (5) different accounts.  See Gov. Trial Exs. 10-13, 23.  The accounts were set up by Defendant Rembert using his personal information, such as his name, address, date of birth, social security number, and his driver's license.   See Gov. Trial Exs. 10b, 10d, 11, 11c, 13.  Shortly after the accounts were opened, Rembert began depositing ward checks.  As the Government summarized:

SunTrust account opened by Rembert in May 2015 for CWR Medical [and] first ward check deposited [was in] June 2015.

Bank of America account opened by Rembert in January 2016 for Grace Home for Children [and] first ward check deposited [was in] February 2016.

Bayport Credit Union account opened by Rembert in August 2016 for Grace Home for Children [and] first ward check deposited [was in] August 2016.

PNC Bank account opened by Rembert in May 2016 for Grace Home for Children [and] first ward check deposited [was in] June 2016.

SunTrust account opened by Rembert in February 2018 for Grace Home for Children [and] first [ward] check deposited [was in] February 2018.

(Doc. No. 218 at 5-6) (citing Gov. Trial Exs. 10b, 11, 11c, 10d, 13, 23).

During the scheme, the financial records showed that Defendant Rembert was the only authorized user for four of the accounts. See Gov. Trial Exs. 10b, 11, 11c, 10d, 13, 23. The Bayport Credit Union account did have a second authorized user, Chonita Collins, but she was added to the account on August 28, 2017 after the final deposit of ward money had been made. (Doc. No. 200 at 124:17-125:20, 164:10-164:17.)

After Defendant Rembert deposited the ward money into his business accounts, he made ninety-four (94) cash withdrawals totaling $388,129. See Gov. Trial Exs. 10-12, and 23. He withdrew the money through structured withdrawals under the currency transaction reporting requirements. See Gov. Trial Ex. 23; see also Doc. No. 200 at 128:22-129:3, 133:16-133:22, 135:2-137:13. The withdrawals were frequent and made shortly after the ward checks had been deposited. Id.

In addition to the cash withdrawals, Defendant Rembert used ward money to obtain three cashier's checks totaling $217,082.40. See Gov. Trial Ex. 23 at 9, 11, 15. These checks were

obtained in Virginia and were subsequently deposited by Defendant Byars and her friend Pamela Gordon[3] in Pennsylvania.  Id.

Trial testimony proved that no services were provided by Defendant Rembert or his companies to any wards and that CWR Medical and Grace Home for Children were not operating businesses.  Family members of Defendants' ward victims testified that despite Defendant Rembert depositing checks from the wards' accounts, CWR Medical and Grace Home for Children never provided services for the wards.  For example, Lillian Viglianese, the niece of ward Theresa Rzemieniewski,[4] testified that Defendants Byars, Rembert, and Mitchell never provided services to her aunt, despite depositing checks from her account:

> Q.  In the time … period when Gloria Byars was [Theresa Rzemieniewski's] guardian, did she receive any outside medical treatment or assistance during that period?
>
> A.  No.
>
> Q.  Any other hospital visits?
>
> A.  No.
>
> Q.  Any ICU, intensive care unit, visits?
>
> A.  No.
>
> Q.  Are you aware of any services provided by companies under the name of ICU Records Billing or ICURB to your aunt?
>
> A.  No.

---

[3]  Pamela Gordon, a friend of Defendant Byars, testified that she assisted Defendant Byars in depositing and cashing a $95,682.40 cashier's check obtained from Defendant Rembert.  (Doc. No. 199 at 33:20-33:20; see also Gov. Trial Exs. 10h, 10j.)

[4]  Defendant Byars was appointed guardian for Theresa Rzemieniewski.  (Doc. No. 199 at 133:6-133:7.)  At the time of Defendant Byars' appointment, Theresa Rzemieniewski was in her seventies, blind, and suffering from Alzheimer's.  (Id. at 199 at 133:12-133:15.)  Her niece testified at trial that Theresa Rzemieniewski was "on a feeding tube. So she couldn't see; she couldn't really talk legibly or hold a conversation with anybody."  (Id.)

Q.  Are you aware of any services by a company known as ACC Medical[5] to your aunt?

A.  No.

Q.  Are you aware of any services provided by company CWR Medical to your aunt?

A. No.

Q. Are you aware of any services that the defendant in this case, Carlton W. Rembert, or Alesha Mitchell provided to your aunt?

A. No.  Never heard of them.

Q. Did any company or any people from Virginia ever come up and provide services to your aunt?

A. No.

(Doc. No. 199 at 138:15-139:13.)  Lillian Viglianese testified to the following when she was shown a check made from her aunt to Defendant Rembert's company, CWR Medical:

Q.  Do you see your aunt's name on this check?

A.  Yes. It says Theresa Rzemieniewski, ward.

Q.  Okay. And do you see her guardian at the time, Gloria Byars, underneath that?

A.  Yes.

Q.  And this is from August of 2016?

A.  Yes, to a CWR Medical.

…

Q.  Okay. And where's the money from your aunt's ward account going?

A.  CWR Medical.

Q.  Have you ever met the owner of CWR Medical, who's sitting here in court today, Carlton W. Rembert?

---

[5]    ACC Medical was a business opened by co-conspirator Alesha Mitchell.

A. No.

(Id. at 141:11-142:2.)

Similarly, Wilma Taylor testified that her uncle, Floyd Holley,[6] never received services from Defendant Rembert despite the fact that a $121,400 check was sent to Grace Homes:

Q:  […] Do you have that exhibit in front of you?

A. Yes.

Q.  Okay. And is that 121,400-dollar check dated July 31st, 2017, paying in the order of Grace Homes?

A. Yes.

Q.  Okay. And do you see your uncle's name, Floyd Holley, there?  As the remitter in the upper lefthand corner.

A.  Oh, yes. Um-hum.

Q.  Do you know what this 121,400 dollars to Grace Home was used for?

A.  No.

Q.  Did Grace Homes ever provide any services to your uncle that you're aware of?

A.  No, not that I'm aware of.

Q.  Are you aware of other checks written from your uncle's account to Grace Homes, including a 32,000-dollar check, December 2016; a 43,000-dollar check, April 2017; a 125,000-dollar check, February 2015? Are you aware of any of those?

A.  No.

Q.  Are you aware of any services or goods or consulting that was provided for that money?

A.  No.

---

[6]   Defendant Byars was appointed as a guardian for Floyd Holley.  (Doc. No. 200 at 179:3-179:9.) His niece testified at trial that he suffered from "double dementia" and struggled with memory loss and taking care of himself.  (Id. at 179:16-181:25.)

(Doc. No. 200 at 185:1-185:23.)

Further, the evidence presented at trial also showed that Defendant Rembert was unable to produce any records of clients or services provided to detectives. Detective Edward Rosen testified that during a call with Defendant Rembert in November of 2019, Defendant Rembert told him about CWR Medical:

> A.  […] I asked him about CWR Medical and -- and what services the company provided.
>
> Q.  And what did he say?
>
> A.  He told me he had about ten clients in the Virginia area. He -- and that he did a consulting service, or a referral service, for these clients. He told me that based on what the client's needs were, he would refer them for medical services. He would arrange contractors to build things, if needed.  And -- and again, these clients were in the Virginia area.
>
> …
>
> Q.  Did the defendant recall any of his clients?
>
> A.  Not one.
>
> Q.  Did the defendant recall any of the particular services that his company performed?
>
> A.  None.
>
> Q.  Did you ask whether CWR Medical had any other employees?
>
> A.  I did. And he was the sole employee and the -- he told me the sole signer on the bank account.

(Doc. No. 199 at 60:10-61:19.)

Detective Rosen inquired about records that Defendant had for his business:

> Q.  Did you ask the defendant about -- kind of records for his business?
>
> A.  I did. I asked if I -- if he had records to support what work he had done. And he told me his records were stored at an off-site location and then told me later he wouldn't be able to access them for three weeks.

(<u>Id.</u> at 61:17-61:25.)  Defendant Rembert never produced any such records to detectives:

> Q.  Did you ever follow up with the defendant by phone to inquire as to those records?
>
> A.  I did.
>
> Q.  Was there any response?
>
> A.  There was not.

(<u>Id.</u> at 63:22-64:1.)

## C.  Co-Conspirator Mitchell's Testimony at Defendant Rembert's Trial

At trial, Defendant Alesha Mitchell testified about her involvement in the scheme.  She testified that she got to know Defendant Gloria Byars as a friend but at some point, they began discussing working together:

> Q.  At some point, did Ms. Byars and you have a discussion about you making money, an opportunity for you to make money with Ms. Gloria Byars?
>
> A.  [Co-conspirator Mitchell:]  She wanted -- well, wanted to help, I guess, or wanted to -- well, she said she was going to help me become a guardian myself.  So yes, we were discussing things, and then she was discussing how I would come to work for her.
>
> Q.  Did you want to become a guardian?
>
> A.  Yes. I -- I thought she was very successful.
>
> Q.  What made you think that Ms. Byars was very successful?
>
> A.  The things that she would do. I -- you know, I kept in contact with her throughout the years. Eventually, she started inviting me to her cookouts, and they were very elaborate, very nice.
>
> …
>
> Q.  Tell the jury about the discussion you had about you wanting to become a guardian.  What did she say?

A.  Well, she -- she wanted to, I guess -- I don't know. She was just talking about me having to move up here[7] in order to help, but instead, in turn, you know, until that happens, I can come and, you know, work for her.

Q.  And did she say what you would do for her, what kind of work?

A.  She gave me specific instructions on what I needed to do to open a business and to -- basically, if I was to come work for her, to not ask any questions.

(Doc. No. 199 at 150:8-151:15.)

Mitchell proceeded to explain that Defendant Byars told her to create a business account

and guided her through the process:

Q.  What did you do in order to open the business?

A.   So this is my first time opening a business, so she pretty much gave the guidelines on how to get my company name.  And she specifically, you know, said it had to be medical billing.  I could name it whatever I want, medical billing, and then the steps on how to open a business bank account

…

Q.  Now, what did you name your company when you were working with Ms. Byars? What did you name it?

A.  ACC Medical Billing.

Q.  And what part of that title did you come up with, and what part did Ms. Byars come up with?

A.  ACC was the part I came up with, and she told me it had to say medical billing.

Q.  Did she say why it had to say medical billing?

A.  She didn't -- she didn't say. That was just the stipulation[].

Q.  Did you ask why?

A.  Well, yeah. I guess to do medical billing, she said that she would be sending me bills, so -- in a sense.  That's why she said it.  She didn't go any -- into any further detail.

---

[7]    At the time, Mitchell was residing in Virginia.  (Doc. No. 199 at 149:1.)

(Id. at 151:16-152:22.)

Despite setting up a medical billing company, Mitchell testified that she did not operate a

medical billing service:

Q.  Do you have a medical billing background?

A.  I did go to school, and I did pass a class in medical billing.

Q.  But did you operate a medical billing service?

A.  No.

Q.  Or have a medical billing business at all?

A.  No.

Q.  Did you ever have a job where you worked doing medical billing?

A.  No.

(Id. at 152:23-153:7.)

Mitchell proceeded to testify about how the scheme operated:

A.  I just waited on Ms. Byars to send me text messages stating that she was sending me bills, how much they were for, what I was to send her, and what I can keep from the bill.

Q.  When you say "bill", what did you receive from -- describe what you mean by "bill".

A.  I would receive checks in the mail from her home address.

Q.  Did you ever receive any bills? You're saying bill, but did you ever receive any bills?

A.  No.

Q.  And what would you describe as a bill? How would you describe a bill? What is a bill?

A.  Something that you owe or you have to pay.

Q.  And did you ever get any bills from Ms. Byars?

A.  No.

(Id. at 153:19-154:7.)

Once Defendant Byars sent Mitchell ward checks, she would deposit those checks and then send cash back to Defendant Byars.  Mitchell testified that when she received a check she "did what [Defendant Byars] instructed [her] to, which was to deposit the check into the account and then send her cash money back through the mail.  And -- and then I could keep, I don't know, a portion of it."  (Id. at 155:21-155:24.)

Between July 2014 and February 2016, Defendant Byars mailed Mitchell twenty-four (24) checks from ward accounts along with two checks from Defendant Byars' ICURB account, totaling $142,973.35.  See Gov. Trial Ex. 23 at 13-15; see also Doc. No. 199 at 155:12-160:10, 165:23-177:7.  Mitchell deposited the checks and withdrew $113,718 in cash and mailed the cash along with a $20,000 cashier's check to Defendant Byars.  (Doc. No. 199 at 155:12-160:10, 165:23-166:7.)  Despite receiving checks from ward accounts, Mitchell testified that she did not know the wards and provided no medical billing services to them.  As a result of her actions, Mitchell pled guilty to a charge relating to her participation in the scheme to defraud.  (See Doc. No. 56.)

## III.    STANDARD OF REVIEW

### A.  Federal Rule of Criminal Procedure 29: Motion for Judgment of Acquittal

Under Federal Rule of Criminal Procedure 29, a defendant may file a motion for judgment of acquittal based on insufficient evidence presented at trial.  See Fed. R. Crim. P. 29(c).  On a motion for judgment on acquittal under Rule 29, the court must decide whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" based on the evidence presented at trial.  United States v. Caraballo-Rodriguez, 726 F.3d 418, 431 (3d Cir. 2013) (en banc) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see also United States v. Tyler, 956 F.3d 116, 122 (3d Cir. 2020).  The court must view the evidence in a light most favorable

15

to the prosecution and must deny the motion "if there is substantial evidence . . . to uphold the jury's decision." Caraballo-Rodriguez, 726 F.3d at 430 (quoting United States v. Gambone, 314 F.3d 163, 170 (3d Cir. 2003)). This standard is highly deferential and dictates that it is not the court's task to "act as the thirteenth juror," weigh credibility, assign weight to evidence, or "substitute [its] judgment for that of the jury." Id. (citations omitted). The decision to overturn a conviction based on insufficient evidence may only be made "where the prosecution's failure is clear," United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005) (quoting United States v. Smith, 294 F.3d 473, 476 (3d Cir. 2002) (citations omitted)), or where the verdict "fall[s] below the threshold of bare rationality," Tyler, 956 F.3d at 122-23 (quoting Caraballo-Rodriguez, 726 F.3d at 431).

**B.  Federal Rule of Criminal Procedure 33: Motion for a New Trial**

Under Federal Rule of Criminal Procedure 33, a "court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. A "court may grant a defendant a new trial only if it finds that 'there is a serious danger that a miscarriage of justice has occurred-that is, that an innocent person has been convicted.'" United States v. Rich, 326 F. Supp. 2d 670, 673 (E.D. Pa. 2004) (quoting United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002)). "In analyzing a verdict under Rule 33, [a] [c]ourt must exercise its own judgment in assessing the Government's case, and does not view evidence favorably to the Government." United States v. Onque, 169 F. Supp. 3d 555, 566 (D.N.J. 2015), aff'd, 665 F. App'x 189 (3d Cir. 2016) (quoting Johnson, 302 F.3d at 150). In general, motions for a new trial based on the sufficiency of the evidence presented at trial are "not favored" and are "granted sparingly and only in exceptional cases." Id. (citing United States v. Brennan, 326 F.3d 176, 189 (3d Cir. 2003)).

IV.     ANALYSIS

   A.  Defendant Rembert's Motion for Judgment of Acquittal Will be Denied

In his Motion, Defendant Rembert argues that the evidence presented at trial was insufficient to sustain the convictions against him.  (Doc. No. 205 at 5.)  The Government disagrees and argues that the evidence presented against Defendant Rembert at trial "was overwhelming" and "demonstrated that [Defendant] Rembert participated in a conspiracy and fraudulent scheme to steal and cash out the life savings of incapacitated wards."  (Doc. No. 218 at 11.)  Defendant Rembert's arguments will be discussed below.

   i.  The Evidence Presented at Trial is Sufficient to Sustain the Conviction on Count One

First, Defendant Rembert argues that a judgment of acquittal should be entered on Count One charging him with conspiracy to commit bank fraud because the evidence presented at trial was insufficient to prove the charge beyond a reasonable doubt.  (Doc. No. 205 at 7.)  He argues that the evidence at trial did not prove the existence of a single conspiracy because he and co-conspirator Mitchell acted separately in assisting Byars.  (Id.)  Instead, the evidence showed the existence of two conspiracies: one involving Defendant Rembert and Defendant Byars and the other involving Mitchell and Defendant Byars.  (Id.)  He maintains that the evidence at trial established "two distinct groups, which operated without knowledge of each other, and where each had dealings with Gloria Byars" and that this is insufficient to sustain a conviction for conspiracy to commit bank fraud.  (Id. at 8.)

As the Government notes, Defendant Rembert's argument "conflates his sufficiency of the evidence argument with an allegation of a variance between the conspiracy charged in the [Superseding] Indictment and the evidence introduced at trial."  United States v. Solomon, 387 F. App'x 258, 262 n.4 (3d Cir. 2010); see also Doc. No. 218 at 12.

"The Fifth Amendment requires that a defendant be tried only for crimes for which he has been indicted." United States v. Scarfo, 41 F.4th 136, 193 (3d Cir. 2022) (citing Stirone v. United States, 361 U.S. 212, 217 (1960)). "There is a variance 'where the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment.'" United States v. Daraio, 445 F.3d 253, 261 (3d Cir. 2006) (quoting United States v. Castro, 776 F.2d 1118, 1121 (3d Cir. 1985)). A defendant alleging a variance also must establish prejudice from the variance. See id. at 262. "To demonstrate prejudice from a variance, a defendant 'must show (1) that there was a variance between the indictment and the proof adduced at trial and (2) that the variance prejudiced some substantial right.'" Id. (quoting United States v. Balter, 91 F.3d 427, 441 (3d Cir. 1996)). The court in Daraio explained when a variance does not prejudice some substantial right:

> "A variance does not prejudice a defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, [or] (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense." United States v. Schoenhut, 576 F.2d 1010, 1021-22 (3d Cir. 1978).

Id.

In United States v. Allinson, the Third Circuit Court of Appeals explained that "[w]here an indictment charges a single conspiracy but the evidence at trial proves only multiple, separate conspiracies, a variance occurs." 27 F.4th 913, 922 (3d Cir. 2022). "When faced with a variance argument, we must first decide 'whether there was sufficient evidence from which the jury could have concluded that the Government proved the single conspiracy alleged in the indictment.'" Id. (quoting United States v. Kelly, 892 F.2d 255, 258 (3d Cir. 1989)). The court continued:

> To assess whether a single conspiracy, rather than multiple conspiracies, existed, we look for sufficient evidence of: (1) a common goal among the conspirators; (2) a common scheme wherein "the activities of one group . . . were 'necessary or

advantageous to the success of another aspect of the scheme or to the overall success of the venture'"; and (3) overlap in the dealings of the conspiracy's participants. Kelly, 892 F.2d at 259 (quoting United States v. DeVarona, 872 F.2d 114, 118-19 (5th Cir. 1989)).

27 F.4th 913, 922 (3d Cir. 2022). Importantly, a single conspiracy does not necessarily transform itself into numerous conspiracies because of a change in personnel or the presence of sub-schemes within the conspiracy. See United States v. Kelly, 892 F.2d 255, 258-59 (3d Cir. 1989). Further, a "single conspiracy can involve one pivotal figure who directs illegal activities while various combinations of other defendants further those activities in different ways and at different times" and "[a] single conspiracy finding does not require every member [of the conspiracy] to participate in every transaction." United States v. Padilla, 982 F.2d 110, 115 (3d Cir. 1992) (internal citations omitted).

Here, no variance occurred between the conspiracy charges set forth in the Superseding Indictment and the evidence introduced at trial. The Government presented substantial evidence showing the existence of a single conspiracy to commit bank fraud.

First, the Government presented sufficient evidence that Defendants shared a common goal: to steal money from incapacitated wards and share the fraudulent proceeds with Defendant Byars and themselves. In considering whether a common goal existed between co-conspirators, courts "look to the underlying purpose of the alleged criminal activity." United States v. Rigas, 605 F.3d 194, 214 (3d Cir. 2010). In United States v. Greenidge, the Third Circuit found that "mak[ing] money by depositing stolen…checks into business accounts" was a common goal amongst co-conspirators. 495 F.3d 85, 93 (3d Cir. 2007). Similarly, here, the evidence showed that Defendants created bank accounts for sham medical service companies and deposited incapacitated ward checks into those accounts without providing any services in return, all for the purpose of stealing ward money. Thus, the evidence presented at trial showed that Defendants

shared a common goal.

Second, the Government presented sufficient evidence that there was a common scheme. In evaluating this factor, courts "look at the nature of the scheme to determine whether the agreement contemplated bringing to pass a continuous result that w[ould] not continue without the continuous cooperation of the conspirators." Greenidge, 495 F.3d at 93 (quoting United States v. Kelly, 892 F.2d 255, 259 (3d Cir. 1989)).   Here, Defendants had a clear modus operandi in committing the fraud that allowed the scheme to continue.   Each Defendant set up a fictious medical billing company: Defendant Byars created ICURB, Mitchell created ACC Medical, and Defendant Rembert created CWR Medical and Grace Home for Children.   At trial, Mitchell explained that her account was opened at the direction and with the guidance of Defendant Byars:

Q.  And did [Defendant Byars] say what you would do for her, what kind of work?

A.  She gave me specific instructions on what I needed to do to open a business and to -- basically, if I was to come work for her, to not ask any questions.

Q.  What did you do in order to open the business?

A.   So this is my first time opening a business, so she pretty much gave the guidelines on how to get my company name. And she specifically, you know, said it had to be medical billing.

…

Q.   Now, what did you name your company when you were working with Ms. Byars? What did you name it?

A.  ACC Medical Billing.

Q.  And what part of that title did you come up with, and what part did Ms. Byars come up with?

A.  ACC was the part I came up with, and she told me it had to say medical billing.

Q.  Did she say why it had to say medical billing?

A.  She didn't -- she didn't say. That was just the stipulation[].

20

Q.  Did you ask why?

A.  Well, yeah. I guess to do medical billing, she said that she would be sending me bills, so -- in a sense. That's why she said it. She didn't go any -- into any further detail.

Q.  Do you have a medical billing background?

A.  I did go to school, and I did pass a class in medical billing.

Q.  But did you operate a medical billing service?

A.  No.

Q.  Or have a medical billing business at all?

A.  No.

Q.  Did you ever have a job where you worked doing medical billing?

A.  No.

(Doc. No. 199 at 151:11-153:7.) As Mitchell's testimony makes clear, Defendant Byars instructed co-conspirator Mitchell to set up fictitious medical billing companies with no intention of providing medical services.  Similar sham companies were set up by Rembert and no medical services were provided to wards.

Once these sham companies were created, the evidence presented by the Government showed that Defendants would deposit ward checks into their company accounts.  Once the checks were deposited into their accounts, Defendants Mitchell and Rembert would make immediate and frequent structured cash withdrawals, which they shared with Defendant Byars.  The structured nature and the frequency of these withdrawals demonstrated that Defendants sought to evade law enforcement or suspicion.  And each Defendant kept a percentage of the stolen funds and never provided any services to the incapacitated wards.  As Mitchell described at trial:

A.  I just waited on Ms. Byars to send me text messages stating that she was sending me bills, how much they were for, what I was to send her, and what I can keep from the bill.

Q.  When you say "bill", what did you receive from -- describe what you mean by "bill".

A.  I would receive checks in the mail from her home address.

Q.  Did you ever receive any bills? You're saying bill, but did you ever receive any bills?

A.  No.

Q.  And what would you describe as a bill? How would you describe a bill? What is a bill?

A.  Something that you owe or you have to pay.

Q.  And did you ever get any bills from Ms. Byars?

A.  No.

(Doc. No. 199 at 153:19-154:7.)

Third, the Government presented sufficient evidence that there was overlap between the co-conspirators.  Defendant Rembert and co-conspirator Mitchell were closely connected with Defendant Byars as family members and longtime friends.  Defendant Byars initiated the scheme in 2012 and remained in the scheme until 2018.  Mitchell joined the scheme in 2014 and remained until 2016.  Defendant Rembert joined the scheme in 2015 and remained until 2018.  They were all part of the larger fraud scheme that was committed to the same objective: enriching themselves by stealing money from the wards.  Their actions were supportive of one another in concealing the movement of funds from ward accounts to fictitious medical companies.  This evidence proved the existence of one overall scheme involving multiple parties that carried out the conspiracy's objective.

Finally, Defendant Rembert has not shown that he was prejudiced in his claim of variance.

All the testimony was consistent with the charge in Count One of the Superseding Indictment and no prejudice has been shown. Further, the jury was instructed on the issue of single or multiple conspiracies. The Court instructed the jury:

> The [I]ndictment charges in Count I that [D]efendant Carlton Rembert and the other alleged conspirators were all members of one single conspiracy to commit bank fraud. Carlton Rembert has argued that there were really two separate conspiracies to commit bank fraud. Whether a single conspiracy or multiple conspiracies exist is a question of fact you must decide. In order to…find [D]efendant Carlton Rembert guilty of the conspiracy charged in the indictment, you must find that the Government proved beyond a reasonable doubt that Carlton Rembert was a member of that conspiracy. If the Government failed to prove that Carlton Rembert was a member of that conspiracy charged in the [I]ndictment, then you must find Carlton Rembert not guilty of conspiracy…In deciding whether there was one conspiracy or more than one conspiracy, you should concentrate on the nature of the agreement proved by the evidence. To prove a single conspiracy, the Government must prove beyond a reasonable doubt that each of the alleged members who were conspirators agreed to participate in what he knew or should have known was a single group activity directed toward a common objective. The Government must prove that there was a single agreement on an overall objective. Multiple conspiracies are separate agreements operating independently of each other. However, finding of a master conspiracy that includes other sub[-]schemes does not constitute a finding of multiple unrelated conspiracies. A single conspiracy may exist when there is a continuing core agreement that attracts different members at different times, and which involves different subgroups committing acts in furtherance of an overall objective.

(Doc. No. 202 at 94:13-96:1.) Thus, the jury was instructed to acquit Defendant Rembert on Count One if the evidence established multiple conspiracies or proof of a conspiracy different than the one charged in the Superseding Indictment.

In this regard, in United States v. Solomon, the Third Circuit, in considering a motion for a new trial in which the issue of variance was raised, held as follows:

> Solomon conflates his sufficiency of the evidence argument with an allegation of a variance between the conspiracy charged in the Indictment and the evidence introduced at trial. To the extent that Solomon argues a variance between the single conspiracy charged in Count One and the purported multiple conspiracies proved at trial, this claim also fails. Not only was the evidence more than sufficient to prove a single conspiracy, but the jury charge included an instruction on single versus multiple conspiracies, curing any potential defect. See United States v. Perez, 280 F.3d 318, 347 (3d Cir. 2002).

<u>Id.</u>  Likewise, here, the jury was instructed on single and multiple conspiracies, which cures any potential defect argued by Defendant Rembert.  Consequently, Defendant Rembert is not entitled to a judgment of acquittal on Count One of the Superseding Indictment.

### ii. The Evidence Presented at Trial is Sufficient to Sustain the Conviction on Count Two

Second, Defendant Rembert argues that a judgment of acquittal should be entered on Count Two because the evidence presented at trial was insufficient to prove beyond a reasonable doubt that he committed bank fraud.  (Doc. No. 2015 at 8.)  Defendant Rembert argues that the Government failed to offer any evidence or witness to show that he personally made the deposits into the five (5) bank accounts.  Further, he argues that the Government failed to show materially false or fraudulent pretenses.

In Count Two of the Superseding Indictment, Defendant Rembert and Defendant Byars are charged with using fraudulently obtained checks written from incapacitated wards' accounts at Wells Fargo Bank to obtain over $382,490.81 of the wards' money and to share the proceeds among themselves and co-conspirator Mitchell.  (Doc. No. 77 at 12.)  In furtherance of the scheme, Defendant Byars wrote and caused twenty-one (21) checks to be written from ward accounts held at Wells Fargo Bank.  (<u>Id.</u> at 13.)  The checks were made payable to Defendant's companies, CWR Medical and Grace Home for Children, so as to make the checks appear to be legitimate.  (<u>Id.</u>) Count Two charges that Defendant knew he did not provide services for the checks he received from Byars and that he deposited all those checks into the bank accounts of his two companies. (<u>Id.</u>)  Count Two also alleges that on or about August 4, 2017, Defendant Rembert obtained a $101,400 cashier's check from his Grace Homes for Children account at Bayport Credit Union made payable to Global Guardian Services and gave the check to Defendant Byars, which was Byars' portion of the fraud proceeds.  (<u>Id.</u> at 14.)  Count Two further alleges that co-conspirator

Mitchell engaged with Byars in the same pattern of conduct.  That is, Byars wrote ward checks to ACC Medical Billing to make the checks appear as legitimate expenses for services provided to the wards when Mitchell knew she did not provide any services to the wards for the checks she received.  (Id. at 13-14.)

In order to prove that a defendant committed bank fraud, in violation of 18 U.S.C. § 1344(2), the Government must show beyond a reasonable doubt that (1) a defendant knowingly executed a scheme to obtain money, funds, or other property owned by or under the control of a financial institution by means of false or fraudulent pretenses, representations, or promises; and (2) that the financial institution was then insured by the Federal Deposit Insurance Corporation ("FDIC").  See Loughrin v. United States, 573 U.S. 351, 355-56 (2014).  Here, the Government presented sufficient evidence at trial to show Defendant Rembert participated in a scheme to defraud Wells Fargo Bank and Defendant Rembert's argument to the contrary is unavailing.

First, Defendant Rembert argues that the evidence was insufficient because there was no evidence that he personally deposited the checks into his companies' accounts or engaged in a deceptive course of conduct.  (Doc. No. 205 at 9.)  As the Government concedes, it is true that the Government did not present eyewitness testimony that he personally deposited the pertinent ward checks.  (Doc. No. 218 at 17-18.)  Nevertheless, the Government presented evidence that all five of the bank accounts were opened and controlled by Defendant Rembert.  As summarized by the Government in its Response in Opposition to Defendant's Motion (Doc. No. 218), the relevant evidence includes the following:

> All five bank accounts were all set up by Rembert, using his name, his address, his date of birth, his social security number, his tax identification number, his company's name, his purported title in the company, his signature, and his driver's license. Gov. Trial Exs. 10b, 11, 11c, 10d, 13, 23. Once opened, the deposits of ward checks immediately followed. Id.

> Rembert was the sole authorized user for each of the five accounts during their use in the fraud scheme. Id. Notably, although a second authorized user (Chonita Collins) was added to the Bayport Credit Union account on August 28, 2017, she was added after the last ward deposit had already been made into the account, and also after the cash had been withdrawn by Rembert. Trial Tr. 11/8/23 at 124:17 – 125:20, 164:10-17; see also Gov. Tr. Ex. 12; Gov. Trial Ex. 23 at 7-9.
>
> Following receipt of the ward money into his business accounts, Rembert personally made withdrawals from the accounts, totaling $388,129 in cash, as evidenced by the withdrawal slips that identified Rembert by his name, signature, driver's license, address, accounts, and businesses, and which all occurred at branch locations near Rembert's residence. Gov. Trial Exs. 12a-b, 10-13, and 23 at 1-12.
>
> The bank records also show that Rembert personally obtained cashier's checks worth $217,082.40 from the ward money deposited into these accounts. Gov. Trial Exs. 10h and 10j (identifying Rembert as the person who obtained a $95,682.40 cashier's check); Gov Trial Exs. 5 and 12a (identifying Rembert as the person who obtained a $20,000 a certified check); Gov. Trial Exs. 7 and 12a (identifying Rembert as the person who obtained a $101,400 cashier's check).
>
> In addition to personally withdrawing cash and obtaining cashier's checks, Rembert spent the remaining ward funds – nearly $80,000 – on personal expenditures in and near his hometown of Norfolk, Virginia. Trial Tr. 11/8/23 at 133:10 – 134:5, 144:7-10; see also Gov. Trial Ex. 23.
>
> When interviewed by detectives, Rembert admitted that he was the owner and sole employee of CWR Medical, and the only authorized user on its financial accounts. Trial Tr. 11/7/23 at 58:19 – 64:1.

(Doc. No. 218 at 19.)  To prove that Rembert participated in the scheme to defraud Wells Fargo Bank, it is not necessary for the Government to produce eyewitness testimony that Rembert personally deposited checks to his own (5) accounts at the different banks.  The evidence described above is sufficient to demonstrate that Defendant Rembert controlled his accounts in question and participated in the scheme to defraud Wells Fargo Bank.

Furthermore, to prove bank fraud, the Government also must show that Defendant Rembert participated in a scheme to obtain money from a financial institution by means of false or fraudulent pretenses, representations, or promises.  Defendant Rembert argues that the Government failed to meet this evidentiary burden by not introducing evidence that shows he made

materially false misrepresentations.  He argues that the Government produced evidence that "checks were deposited repeatedly into bank accounts controlled by [Defendant Rembert]" and that simply "depositing checks, standing alone, does not satisfy" the Government's burden.  (Doc. No. 205 at 10.)  He maintains that his course of conduct consists simply of depositing checks into a bank account while knowing he was not entitled to those funds.  (Id. at 11.)

The evidence presented at trial demonstrates that Defendant Rembert's conduct went beyond simply cashing checks.  He also engaged in a course of conduct showing that he participated in the scheme to obtain money from a financial institution by means of false pretenses and misrepresentations.  The evidence at trial showed that for thirty-three (33) months, Defendant Rembert worked with his sister, Defendant Byars, to carry out and conceal an elaborate fraud scheme to steal money from incapacitated wards.  To carry out this scheme, Defendant Rembert created fictious medical companies to make the transfer of wards' funds seem legitimate and to conceal the scheme.  The evidence showed that Defendant Rembert created five (5) bank accounts across four (4) different financial institutions to further avoid detection of the scheme.  He deposited forty-two (42) checks that contained stolen ward funds into his sham accounts.  After he deposited the checks, he made ninety-four (94) structured cash withdrawals of $388,129 of ward money from the accounts so as not to trigger currency transaction reporting requirements.  He visited multiple branches of the same bank on the same day to make structured withdrawals, which showed the length to which he went to conceal his fraudulent transactions.  He also obtained $217,082.40 in cashier's checks as another way to funnel the ward money back to Defendant Byars.  Once investigators began uncovering the scheme and grew suspicious of Defendant Rembert's companies, he continued to pretend that his medical company was legitimate, falsely claimed to have clients, and that records existed to show the services being provided to the wards.

All of this evidence shows that Defendant Rembert made materially false representations and engaged in a deceptive course of conduct to fraudulently obtain money from federally insured bank accounts of incapacitated wards.  Therefore, there was sufficient evidence to sustain the conviction for bank fraud on Count Two.

### iii.   The Evidence Presented at Trial is Sufficient to Sustain the Convictions on Counts Four and Six

Finally, Defendant Rembert argues that a judgment of acquittal should be entered on Counts Four and Six because the evidence presented at trial was insufficient to prove beyond a reasonable doubt that he committed wire fraud.  (Doc. No. 205 at 12.)  Defendant Rembert was convicted of wire fraud for procuring a $20,000 check from Bayport Credit Union that was deposited into Defendant Byars' account through an interstate wire transmission (Count Four). (Doc. No. 77 at 21.)  In this regard, Count Four of the Superseding Indictment charged that on November 3, 2016 Defendant Rembert caused the following wire transmission:

> Electronic image transmitted by Wells Fargo Bank resulting from the deposit of a $20,000 check drawn on defendant CARLTON REMBERT's Grace Home for Children Bayport Credit Union account ending in 0732 into defendant GLORIA BYARS's Global Guardian Wells Fargo Bank account ending in 9380.

(Id.)  He also was convicted of wire fraud for procuring a $101,400 check from Wells Fargo Bank that was deposited into Defendant Byars' account through an interstate wire transmission (Count Six).  (Id.)  Count Six of the Superseding Indictment charged that on August 15, 2017, Defendant Rembert caused the following wire transmission:

> Electronic image transmitted by Wells Fargo Bank resulting from the deposit of a $101,400 check drawn on defendant CARLTON REMBERT's Grace Home for Children Bayport Credit Union account ending in 0732 into defendant GLORIA BYARS's Global Guardian Wells Fargo Bank account ending in 5251.

(Id.)

To sustain a conviction for wire fraud under 18 U.S.C. § 1343, the record must show that a defendant: "(1) knowingly and willfully participated in a scheme or artifice to defraud, (2) possessed a specific intent to defraud, and (3) used wire communications in interstate commerce, or reasonably foresaw that such wires would be used, in furtherance of the scheme." United States v. Veras de los Santos, 184 F. App'x 245, 252 (3d Cir. 2006).

Defendant Rembert argues that the Government failed to meet its evidentiary burden to prove wire fraud because "the government never presented a witness from Bayport Credit Union to testify about their process and procedure for procuring cashier's checks" and that no eyewitness testified that Defendant Rembert "was the person who obtained the checks." (Doc. No. 205 at 13-14.)

The evidence produced at trial was sufficient to show that Defendant Rembert obtained the $20,000 and $101,400 checks. As summarized by the Government in its Response in Opposition to Defendant's Motion (Doc. No. 218), with respect to Count Four, the trial evidence showed the following:

> On October 26, 2016, Rembert deposited into his BayPort Credit Union account a $37,100 check from Byars' ward V.H. made payable to Grace Homes. Gov. Trial Ex. 2c. Rembert was the sole signatory on the account, which he opened using the name Grace Home for Children, doing business as CWR Medical Services. Gov. Trial Ex. 12.
>
> Five days later, on October 31, 2016, Rembert issued two checks from his BayPort account, totaling $30,000. One of those checks was a $20,000 certified check made out to Byars' company, GGS. The documentary evidence showed that to obtain this certified check, Rembert went to BayPort's branch location in NewPort News, Virginia, and personally signed for the withdrawal. Gov. Trial Ex. 12a (showing Rembert's signature).
>
> Four days later, on November 3, 2016, this certified check was deposited by Byars in Pennsylvania. Gov. Trial Ex. 5. The deposit of this check in Pennsylvania caused an interstate wire transmission between Pennsylvania and Alabama to clear the stolen funds. This interstate wire transmission was foreseeable to Rembert when he obtained the check and sent it to his co-conspirator in Pennsylvania.

(Doc. No. 218 at 22-23) (internal footnote citations omitted).  In sum, the evidence showed that on November 3, 2016, Byars deposited a $20,000 certified check that Defendant Rembert made out to her company, Global Guardian Services.  This caused an interstate wire transmission between Pennsylvania and Alabama.  The $20,000 was sourced from stolen wards' funds.

> With respect to Count Six, the trial evidence showed the following:
>
> On August 2, 2017, Rembert deposited a $121,400 check into his BayPort Credit Union account, which was drawn from the account of Byars' ward, F.H., made payable to Rembert's front company, Grace Homes. Gov. Trial Exs. 2c and 23.
>
> Two days later, on August 4, 2017, Rembert obtained a $101,400 official check, referencing the ward, F.H., made out to Byars' company, GGS. Gov. Trial Ex. 12a. Again, the documentary evidence showed that to obtain this certified check, Rembert went to BayPort's branch location in NewPort News, Virginia, and personally signed for the withdrawal. Id. Moreover, bank records showed that Rembert was still the sole signatory on the Bayport bank account.
>
> On August 15, 2017, Byars deposited this certified check in Pennsylvania. Gov. Trial Ex. 7. The deposit of this check in Pennsylvania caused an interstate wire transmission between Pennsylvania and Minnesota to clear the stolen funds. This interstate wire transmission also was foreseeable to Rembert when he obtained the check and sent it to his co-conspirator in [Pennsylvania].
>
> In this two-day span, Rembert pocketed $20,000 in ward money and Byars obtained $101,400 in ward money free and clear, which she used to fund her parties, wedding, vehicles, vacations, clothes, jewelry, and cash gifts.

(Id. at 23-24.)  In sum, the evidence also shows that on August 15, 2017, Byars deposited a $101,400 certified check that Defendant made out to her company, Global Guardian Services.  This caused an interstate wire transmission between Pennsylvania and Minnesota.  The $101,400 was sourced from stolen wards' funds.

This evidence sufficiently demonstrates that Defendant Rembert was personally involved in obtaining the checks at issue in Counts Four and Six and causing the interstate wire transmissions.  Therefore, the evidence showed that Defendant Rembert committed wire fraud by knowingly and willfully participated in a scheme to defraud, possessed a specific intent to defraud,

and used wire communications in interstate commerce, or reasonably foresaw that such wires would be used, in furtherance of the scheme to defraud.

## B.  Defendant Rembert's Motion for a New Trial Will be Denied

In addition to seeking a judgment of acquittal under Federal Rule of Criminal Procedure 29, Defendant Rembert requests a new trial pursuant to Federal Rule of Criminal Procedure 33. (Doc. No. 205 at 14.)  As described supra, under Federal Rule of Criminal Procedure 33, a "court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33.  A "court may grant a defendant a new trial only if it finds that 'there is a serious danger that a miscarriage of justice has occurred-that is, that an innocent person has been convicted.'"  United States v. Rich, 326 F. Supp. 2d at 673 (quoting United States v. Johnson, 302 F.3d at 150).

In his Motion, Defendant makes three arguments as to why a new trial should be ordered. First, he contends that "once [a] judgment of acquittal is entered on any Counts…a new trial should be ordered on any remaining Counts because of the prejudicial spillover from the admission of evidence and making of argument[s] on acquitted charges."  (Doc. No. 205 at 14-15.)  Second, Defendant Rembert argues that venue was not proper in the Eastern District of Pennsylvania.  (Id. at 15.)  Third, he contends that the Court erred in permitting Defendant Alicia Mitchell to testify at Defendant Rembert's trial.  (Id. at 18.)  Each argument will be discussed in turn.

### i.  Defendant Rembert's Motion for a New Trial Based on Prejudicial Spillover Will be Denied

Defendant argues that if the Court grants a judgment of acquittal on any of the four Counts of conviction, a new trial should be held on the remaining counts due to "spillover prejudice" from the evidence presented to the jury on the acquitted charges.  He argues that a new trial is necessary because the remaining counts are "tainted with evidence and argument[s] regarding those charges on which acquittal is entered."  (Id. at 15.)

In <u>United States v. Cross</u>, the Third Circuit explained that after a judgment of acquittal is granted, a court must determine: "(1) whether the jury heard evidence that would have been inadmissible at a trial limited to the remaining valid count (i.e., "spillover" evidence); and (2) if there was any spillover evidence, whether it was prejudicial (i.e., whether it affected adversely the verdict on the remaining count)."  308 F.3d 308, 317 (3d Cir. 2002).  But, as explained above, Defendant Rembert's motion for a Judgment of Acquittal on Counts One, Two, Four, and Six is being denied.  Therefore, his argument regarding prejudicial spillover is without merit.

### ii. Defendant Rembert's Motion for a New Trial Based on Improper Venue Will be Denied

Next, Defendant Rembert argues that a new trial should be ordered because venue was improper in the Eastern District of Pennsylvania because "[t]he essential conduct elements in this case occurred in Virginia."  (Doc. No. 205 at 15, 17.)  He reasons that while Defendant Byars devised her scheme and stole money from wards in the Eastern District of Pennsylvania, Defendant Rembert's actions occurred in Virginia.  (<u>Id.</u> at 17.)

Federal Rule of Criminal Procedure 18 states: "[u]nless a statute or these rules permit otherwise, the [G]overnment must prosecute an offense in a district where the offense was committed."  Fed. R. Crim. P. 18.  Where Congress has not prescribed specific venue requirements for a particular crime, courts must "determine the crime's <u>locus</u> <u>delicti</u>," which is defined in Black's Law Dictionary as "the place where an offense was committed."  <u>United States v. Auernheimer</u>, 748 F.3d 525, 532 (3d Cir. 2014) (citing <u>United States v. Pendleton</u>, 658 F.3d 299, 302 (3d Cir. 2011); Black's Law Dictionary 1025 (9th ed. 2009)).  "[T]he <u>locus</u> <u>delicti</u> must be determined from the nature of the crime alleged and the location of the act or acts constituting it."  <u>Id.</u> (citing <u>United States v. Anderson</u>, 328 U.S. 699, 703 (1946); <u>United States v. Rodriguez-Moreno</u>, 526 U.S. 275, 279 (1999)).

The Third Circuit Court of Appeals in <u>Auernheimer</u> also stated the following regarding venue for a conspiracy charge:

> Continuing offenses, such as conspiracy, that are "begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). In the context of a conspiracy charge, "venue can be established wherever a co-conspirator has committed an act in furtherance of the conspiracy."

748 F.3d at 533.  (quoting <u>United States v. Perez</u>, 280 F.3d 318, 334 (3d Cir. 2002)).

A venue inquiry requires a court to "distinguish between a statute's 'essential conduct elements' and its 'circumstance elements.'"  <u>United States v. Brennan</u>, 452 F. Supp. 3d 225, 234 (E.D. Pa. 2020).  Only essential conduct elements can provide a basis for venue.  <u>Auernheimer</u>, 748 F.3d at 533.  "Conduct elements describe actions proscribed by a criminal statute, while 'circumstance elements' are 'fact[s] that existed at the time' those actions are performed." <u>Brennan</u>, 452 F. Supp. 3d at 234 (citing <u>Auernheimer</u>, 748 F.3d at 533).

Here, Defendant Rembert argues that the essential conduct elements in this case occurred in Virginia.  (Doc. No.205 at 17.)  However, for reasons that follow, venue was proper in the Eastern District of Pennsylvania.

Regarding Count One, venue can be established for a conspiracy charge "wherever a co-conspirator has committed an act in furtherance of the conspiracy." <u>Auernheimer</u>, 748 F.3d at 533. At trial, the Government introduced evidence of multiple acts that occurred in the Eastern District of Pennsylvania in furtherance of the conspiracy.  For example, Defendant Byars obtained ward checks from RES Consulting, which is located in Havertown, Pennsylvania.  The unauthorized checks were sent from the Eastern District of Pennsylvania to Defendant Rembert in Virginia.  In turn, Defendant Rembert sent cashier's checks to Defendant Byars in the Eastern District of Pennsylvania.  Byars deposited those checks into her bank accounts that were opened in

33

Havertown, Pennsylvania.  This evidence shows that those acts were committed in furtherance of the conspiracy.  Therefore, venue was proper in this District on Count One.

Regarding Count Two, charging bank fraud, venue is proper in any district in which the offenses were begun, continued, or completed.  See 18 U.S.C.A. § 3237.  The evidence showed that the offense began in the Eastern District of Pennsylvania where Defendant Byars stole ward money held at Wells Fargo Bank.  From those accounts, she then made checks payable to fictitious medical companies controlled by her co-conspirators.  They, in turn, deposited the checks, and then withdrew large amounts of cash from their accounts.  After they withdrew the cash, Defendant Rembert and co-conspirator Mitchell would obtain cashier's checks which they sent back to Defendant Byars in the Eastern District of Pennsylvania.  Defendant Byars would then deposit the cashier checks in her Wells Fargo Bank account at the Havertown, Pennsylvania branch in the Eastern District of Pennsylvania.  Thus, the offense of bank fraud began, continued, and was completed in the Eastern District of Pennsylvania and venue was proper in this District on Count Two.

Regarding Counts Four and Six, for wire fraud "venue is proper in any district in which the offenses were begun, continued, or completed."  United States v. Goldberg, 830 F.2d 459, 465 (3d Cir. 1987).  Count Four charged an interstate wire transmission between Pennsylvania and Alabama.  Count Six charged an interstate wire transmission between Pennsylvania and Minnesota.  The interstate wire transmissions involved checks deposited at the Havertown, Pennsylvania branch of Wells Fargo Bank located in the Eastern District of Pennsylvania to accounts controlled by Gloria Byars.  Therefore, the wire fraud offenses charged in Counts Four and Six were begun continued and completed in the Eastern District of Pennsylvania.  Accordingly, venue was proper in this District on Counts Four and Six.

### iii. Defendant Rembert's Motion for a New Trial Based on the Court Permitting Defendant Alesha Mitchell's Testimony Will be Denied

Finally, Defendant Rembert argues that a new trial should be granted because the Court erred in allowing his co-conspirator Alesha Mitchell to testify at trial. (Doc. No. 205 at 18.) Mitchell did not engage in any conduct with Defendant Rembert and only met him at a party thrown by Gloria Byars. He contends that "[w]hile [Mitchell] may have conspired with [Defendant Byars], and her testimony would have been relevant had [Defendant Byars] gone to trial, the probative value of her testimony was substantially outweighed by the danger of unfair prejudice." (Id.)

First, Mitchell's testimony was properly admitted under Federal Rule of Evidence 801(d)(2)(E) as non-hearsay co-conspirator statements. Pursuant to Federal Rule of Evidence 801(d)(2)(E), statements made by a party's co-conspirator during and in furtherance of the conspiracy are not hearsay. Fed. R. Crim. P. 801(d)(2)(E). Generally, when a person joins a conspiracy, his co-conspirators become his agents and are each responsible for the acts and statements of others given "the common sense appreciation that a person who has authorized another to speak or to act to some joint end will be held responsible for what is later said or done by his agent, whether in his presence or not." United States v. Trowery, 542 F.2d 623, 626 (3d Cir. 1976). Further, individuals can be co-conspirators even if they do not know that the other is participating in the conspiracy. United States v. Rinaldi, No. 3:18-CR-279, 2021 WL 1212669, at *13 (M.D. Pa. Mar. 31, 2021), aff'd, No. 21-2419, 2023 WL 3034327 (3d Cir. Apr. 21, 2023). Therefore, Defendant Rembert's argument that Mitchell's testimony was inadmissible at his trial because "[s]he never had any communications with Mr. Rembert, and only met him once" fails and her testimony was properly admitted pursuant to Federal Rule of Evidence 801(d)(2)(E). (Doc. No. 205 at 18.)

In addition, Defendant Rembert argues that Mitchell's testimony was inadmissible under to Federal Rule of Evidence 403.  Under this Rule, a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Here, Defendant Rembert argues that Mitchell's testimony's probative value was substantially outweighed by the danger of unfair prejudice because it allowed the jury to "substitute conjecture with facts."  (Doc. No. 205 at 19.) This argument is unavailing because Mitchell's testimony was probative and not unfairly prejudicial.  Mitchell's testimony as a co-conspirator described how the conspiracy worked, including her participation in the scheme and her interaction with her co-conspirator.  Mitchell described how Defendant Byars instructed her to create a fictious medical billing company.  She testified that she did not provide medical billing services and did not offer any services to wards for the money she received.  In short, she admitted that she was involved in the scheme to funnel stolen money taken from incapacitated wards.  This testimony was probative in understanding the scheme and its goals.  Therefore, admitting her testimony was proper and Defendant will not be granted a new trial based on this argument.

### V.    CONCLUSION

For the foregoing reasons, Defendant Rembert's Motion for Judgment of Acquittal and a New Trial (Doc. No. 205) will be denied.  An appropriate Order follows.